T.C. Memo. 2018-153

UNITED STATES TAX COURT

JEFF M. POTTER AND MARSHA R. POTTER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

POTTER SALES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4972-14, 5754-14.          Filed September 17, 2018.

Steven P. Flowers, for petitioners.

William F. Castor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  These cases have been consolidated for trial, briefing, and

opinion.  Respondent determined deficiencies and accuracy-related penalties under

section 6662(a) relating to the Federal income tax of Jeff M. Potter and Marsha R.

**[\*2]** Potter and Potter Sales, Inc. (Potter Sales).[1]  For the Potters, respondent determined deficiencies of $6,674 and $4,728 and accuracy-related penalties of $81,629.40 and $945.60 for 2010 and 2011, respectively.  For Potter Sales, respondent determined deficiencies of $81,260 and $598 and accuracy-related penalties of $16,252 and $119.60 for 2010 and 2011, respectively.

After concessions,[2] the issues for decision are:  (1) whether the termination payment Green Country Soils, Inc. (Green Country), paid to Mr. Potter in 2010 was capital gain or ordinary income; (2) if the termination payment was ordinary income, whether it is subject to self-employment tax; (3) which taxpayer--Mr. Potter, individually, or Potter Sales--entered into the cowboy mounted shooting activity (activity) for the years in issue; (4) if the activity was Mr. Potter's, whether the activity was entered into for profit for the years in issue; and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners concede that:  (1) Mr. and Mrs. Potter received a constructive dividend of $20,172 in 2010, see infra pp. 5-6 and note 7; (2) the $200,000 Mr. Potter received in 2010 for a covenant not to compete with Oldcastle Lawn & Garden, Inc. (Oldcastle), was ordinary income; and (3) Potter Sales is liable for unreported gross receipts of $7,950 for 2010.  The parties also made several concessions in the stipulation of facts regarding Potter Sales' expenses reported on the Forms 1120, U.S. Corporation Income Tax Return, and these concessions will be binding in the Rule 155 computations.

[*3] (5) whether petitioners are liable for accuracy-related penalties for the years in issue.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts and facts drawn from the stipulated exhibits are incorporated herein by this reference. Mr. and Mrs. Potter resided in Oklahoma and Potter Sales had its principal place of business in Oklahoma when they timely filed their petitions.

### I. Working With the Family Business

Mr. Potter began working with Green Country in the early 1990s. Mr. Potter's younger brother was Green Country's president and majority shareholder. In 1995 Mr. Potter--in his individual capacity--entered into a written independent sales representative compensation agreement (compensation agreement) with Green Country. Under the compensation agreement Mr. Potter was treated as an independent contractor and received a commission on all sales of Green Country

---

[3]Respondent also determined that the Potters were liable for alternative minimum tax for 2011. This determination was computational and will not be discussed further.

[*4] products to any person or entity whose account he either served or obtained.[4] The compensation agreement also provided that if either party terminated the agreement Mr. Potter would be entitled to an amount equal to 1-1/2 times his commissions for the previous year. He also had the option to declare the compensation agreement terminated if Green Country was ever sold or transferred. The compensation agreement provided that Mr. Potter could not assign or transfer his obligations under the agreement without Green Country's written consent.

Mr. Potter incorporated Potter Sales in 1998. At all relevant times he was its sole shareholder and president. He was also a full-time employee of Potter Sales. From its incorporation until 2010, Mr. Potter performed his duties under the compensation agreement as Potter Sales.[5] All commissions earned were then paid to Potter Sales. From at least 2005 and through the years in issue, it, in turn, paid a salary to Mr. Potter and issued him Forms W-2, Wage and Tax Statement. During that time Potter Sales' only client was Green Country, and Mr. Potter

---

[4]Green Country bagged and sold potting and top soils, manures, peat, mulches, and rocks.

[5]There is no evidence in the record of Green Country's written consent to Mr. Potter's performance of his duties under the compensation agreement through Potter Sales.

[*5] routinely worked longer than 12 hours a day selling Green Country's products. At no time was Mr. Potter a shareholder or officer of Green Country.

In 2010 Oldcastle, a garden soil competitor, approached Green Country regarding selling its assets and existing sales contracts in an attempt to move into Green Country's marketing areas. Soon thereafter Green Country and Potter Sales entered into an asset purchase agreement (purchase agreement) with Oldcastle. Green Country's number one sales representative, Mr. Potter, in his individual capacity, is also listed as a party to the purchase agreement. Oldcastle acquired all of Green Country's and Potter Sales' assets. The assets Oldcastle acquired from Potter Sales were office equipment, furniture, and vehicles used for sales purposes. Neither Potter Sales nor Mr. Potter received any compensation for those items under the purchase agreement. The purchase agreement with Oldcastle specifically excluded the assumption of certain liabilities, including any termination payments.

The Green Country compensation agreement terminated upon Oldcastle's purchase of Green Country. Mr. Potter and Green Country agreed that Mr. Potter was entitled to a termination payment equal to 1-1/2 times his commissions from the previous year, totaling $1,729,828.40. On October 15, 2010, Green Country completed a wire transfer of $1,929,828.40 to Potter Sales' bank account--the

[*6] termination payment plus payment for the covenant not to compete of $200,000 due to Mr. Potter under the purchase agreement.[6] Potter Sales recorded the $1,929,828.40 as a liability to Mr. Potter in its general ledger. On November 2, 2010, Potter Sales completed a wire transfer of $1,750,000 to Mr. Potter.[7] Potter Sales recorded the transfer as a debit to its "Notes Payable - Jeff Potter" account.

## II.    Want To Be a Cowboy?

With a bit of free time on his hands, a history of working long hours, and the desire to continue working, Mr. Potter began looking for something to fill his days. Several years before the Oldcastle sale he had been introduced to the activity, which is a timed event where an individual rides a horse through a

---

[6]There is no explanation in the record as to why Green Country paid the $200,000 due to Mr. Potter under the purchase agreement when the covenant not to compete was entered into between Mr. Potter and Oldcastle. Although originally reported as the sale of a capital asset on the Schedule D, Capital Gains and Losses, attached to their 2010 Form 1040, U.S. Individual Income Tax Return, petitioners conceded the $200,000 was ordinary income, see supra note 2, so the Court will not concern itself with the issue.

[7]The Potters conceded that the difference between the termination payment of $1,729,828 and the $1,750,000 Potter Sales transferred--$20,172--was a constructive dividend in 2010. See supra note 2.

[*7] designated course while shooting a firearm at targets.[8] The activity is governed by two organizations--the Cowboy Mounted Shooting Association (CMSA), formed in the mid-1990s, and the Mounted Shooters of America (MSA), formed in 2000.

In late 2009 Mr. Potter began taking lessons for the activity. He had previously purchased a horse, Dakota, for pleasure riding. After some training Dakota proved quite adept at learning the activity. During the years in issue Mr. Potter entered CMSA events. Potter Sales paid the events' entry fees and other expenses related to the activity. CMSA paid prize money won at the events directly to Mr. Potter and issued him Forms 1099-MISC, Miscellaneous Income, for such payments during the years in issue. All prize money won was deposited into Potter Sales' bank account.

In 2010, after Mr. Potter and Dakota successfully competed in the CMSA world competition, Potter Sales purchased a Chevrolet Silverado pickup truck for $48,205.46, a large horse trailer with living quarters for $104,500, and a tractor for

---

[8]The rider's firearm is loaded with primer and black powder that will shoot approximately 20 feet and make contact with the targets, i.e., balloons. The embers of the powder burst the balloons.

[*8] $9,250 to be used in the activity.[9] Each of these assets was recorded on Potter Sales' books as a capital asset subject to depreciation and reported on the depreciation schedule attached to its 2010 Form 1120.

III.  The Income Tax Returns, the Agreement to Assess, and the Notices of Deficiency

On their 2010 Form 1040 the Potters reported the termination payment of $1,729,828 as the sale of goodwill and the covenant not to compete payment of $200,000 as capital gain. They also attached a Schedule C, Profit or Loss From Business, for the activity to their 2010 return. They reported the CMSA events prize money as gross receipts, claimed cost of goods sold equal to the gross receipts, and reported a net profit of zero on the basis that Mr. Potter was paid the prize money as Potter Sales' nominee. They reported the 2011 CMSA prize money in the same manner. Potter Sales reported the CMSA prize money as gross receipts for 2010 and 2011. It also claimed deductions for expenses related to the activity. Potter Sales did not include the termination payment or the covenant not to compete payment on its 2010 Form 1120 in any manner. The Potters and Potter Sales had the same certified public accountant (CPA) prepare the returns for both

---

[9]By 2014 Mr. Potter was a successful competitor and had won several national titles in the activity, including the MSA nonpro world title and the amateur American Paint Horse Association world title, and finished second in the CMSA world competition.

**[*9]** years in issue. Mr. Potter discussed the termination payment and the activity on several occasions with his CPA. Additionally, petitioners gave their CPA all the information necessary for him to prepare their Federal income tax returns. At the time of trial their CPA had been a licensed CPA for 35 years, and he had prepared the Potters' income tax returns for approximately that long. He has also prepared Potter Sales' income tax returns since its incorporation.

On May 13, 2013, during a review of the Green Country sale, the Potters' previous legal representative signed Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, agreeing to an assessment of tax of $401,473 for 2010. Form 4549-A, Income Tax Discrepancy Adjustments, dated May 8, 2013, lists the termination and the covenant not to compete payments as the adjustments. Those payments were changed from capital gain to ordinary income subject to self-employment tax. There is no penalty listed on the Form 870 or the accompanying Form 4549-A. Form 870 includes the following statement: "I understand that by signing this waiver, I will not be able to contest these years in the United States Tax Court unless additional deficiencies are determined for these years." The tax assessed has been paid.

[*10] On December 3, 2013, respondent issued the Potters a notice of deficiency determining deficiencies of $6,674 and $4,728 and accuracy-related penalties of $81,629.40 and $945.60 for 2010 and 2011, respectively. Respondent's position is that the accuracy-related penalty reflected on the notice of deficiency for 2010 relates back to the assessment on the Form 870. Respondent also issued Potter Sales a notice of deficiency dated December 3, 2013, determining deficiencies of $81,260 and $598 and accuracy-related penalties of $16,252 and $119.60 for 2010 and 2011, respectively.

IV.   Respondent's Motion To Reopen the Record

On January 12, 2018, respondent filed a motion to reopen the record to submit additional evidence. Attached to the motion is the declaration of Laura L. Vidal, who was the immediate supervisor of the revenue agent who conducted the examination of the Potters' and Potter Sales' returns. Also attached to the motion are two Civil Penalty Approval Forms (penalty approval form)--one for the Potters and one for Potter Sales--that Ms. Vidal signed.

OPINION

I.   Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect. See Rule

[*11] 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).

Under certain circumstances the burden of proof as to factual matters regarding the determination of a deficiency may shift to the Commissioner pursuant to section 7491(a).  Petitioners did not argue for a burden shift under section 7491(a), and the record does not establish that the prerequisites for a burden shift have been met; therefore, the burden of proof remains theirs.

II.     The Termination Payment

The Potters agreed to an assessment of $401,473 for 2010, which included tax on the termination payment as ordinary income subject to self-employment tax.  A taxpayer's consent to assessment and collection on a Form 870 merely frees the Commissioner from the obligation to issue a notice of deficiency before assessment.  <u>Elco Constr. Co. v. Commissioner</u>, T.C. Memo. 1965-259, 24 T.C.M. (CCH) 1406, 1410 (1965).  Respondent's subsequent issuance of the notice of deficiency determining an additional deficiency for 2010 and petitioners' filing a timely petition give the Court jurisdiction over the entire year, including the

[*12] amount which the Potters agreed to have assessed on the Form 870.  See sec. 6214(a); Bowman v. Commissioner, 17 T.C. 681 (1951).  The Court must answer two questions about the termination payment:  (1) whether it was for the sale of Mr. Potter's goodwill and (2) if not, whether it is subject to self-employment tax.

A.    Goodwill?

The questions of whether goodwill existed and was transferred are questions of fact.  Butler v. Commissioner, 46 T.C. 280, 287 (1966).  Petitioners scream for Martin Ice Cream Co. v. Commissioner (Martin Ice Cream), 110 T.C. 189 (1998), to rule the day because what Mr. Potter "sold" were his relationships with the various buyers of Green Country's products.  In Martin Ice Cream, 110 T.C. at 207-208, the Court held that the benefits of the relationships with supermarket chains that a shareholder, Arnold Strassberg, cultivated were not the corporation's assets; Mr. Strassberg was the owner and seller of those assets.  Thus, the corporation--Martin Ice Cream Co.--was not liable for tax due on payments for the shareholder's assets.  The Court decided that the goodwill was not a corporate asset in Martin Ice Cream and did not address how the individual shareholder--Mr. Strassberg--should be taxed on the payments.  See Kennedy v. Commissioner, T.C. Memo. 2010-206, 100 T.C.M. (CCH) 268, 274-275 (2010).  Thus, Martin Ice Cream is not controlling here.

**[\*13]** What is controlling is the fact that Mr. Potter did not sell a trade or business. See Baker v. Commissioner, 118 T.C. 452 (2002) (holding that the taxpayer did not sell a trade or business to which goodwill could attach), aff'd, 338 F.3d 789 (7th Cir. 2003). "To qualify as the sale of goodwill, the taxpayer must demonstrate that he sold 'the business or a part of it, to which the goodwill attaches.'" Id. at 465 (quoting Schelble v. Commissioner, 130 F.3d 1388, 1394 (10th Cir. 1997), aff'g T.C. Memo. 1996-269). Although a party to the asset purchase agreement between Oldcastle and Green Country, Mr. Potter did not sell any assets to Oldcastle or to Green Country. The word "sale" means "a transfer of property for a fixed price in money or its equivalent". Schelble v. Commissioner, 130 F.3d at 1394 (quoting Iowa v. McFarland, 110 U.S. 471, 478 (1884)); see also Commissioner v. Brown, 380 U.S. 563, 571 (1965). Potter Sales' office furniture, computers, and vehicles were included in the assets Oldcastle acquired when it purchased Green Country's assets, but it paid nothing for them.[10] Additionally, Potter Sales had only one client, Green Country. The relationships that Mr. Potter fostered were with Green Country's clients; the client contacts were not his to sell. See Foxe v. Commissioner, 53 T.C. 21, 26 (1969) (finding that an insurance

---

[10]Nor did Mr. Potter "exchange" property for another property that was materially different in either kind or extent. See sec. 1.1001-1(a), Income Tax Regs.

[*14] salesman's personal contacts with customers did not amount to goodwill because the insurance company owned the customer contacts). Therefore, the 2010 termination payment was for Mr. Potter's right to service Green Country's clients and receive ordinary income; it was not for the sale of Mr. Potter's goodwill, because the client contacts were not his to sell.

B. Self-Employment Income?

Mr. Potter entered the compensation agreement with Green Country as an independent contractor, and it expressly stated that the parties agreed that he was an independent contractor. Sometime soon after that he incorporated Potter Sales, and Green Country began paying all of his commissions to the corporation. Mr. Potter was a salaried employee of Potter Sales. Although express written agreement was required before Mr. Potter could assign or transfer his obligations under the compensation agreement, no such written agreement between Mr. Potter and Green Country assigning or transferring his obligations to Potter Sales was entered into evidence. But Green Country paid Potter Sales the commissions Mr. Potter earned for at least 12 years. The compensation agreement provided that Mr. Potter was entitled to the termination payment if Green Country terminated his employment without cause, if he terminated his relationship with Green Country, or if the controlling interest of Green Country was sold or transferred. The basis

[*15] for the termination payment was Mr. Potter's commissions from the previous year. The parties stipulated that the termination payment was Mr. Potter's and not Potter Sales'.

Section 1401 imposes a tax upon each individual's "self-employment income". Section 1402(b) defines "self-employment income" as "net earnings from self-employment" with certain exceptions not relevant here. Section 1402(a) defines "net earnings from self-employment" as "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". For income to be taxable as self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on." Newberry v. Commissioner, 76 T.C. 441, 444 (1981). For there to be a "nexus" and the income to be subject to self-employment tax, the income must arise from some actual--past, present, or future--income-producing activity of the taxpayer. Id. at 446. Additionally, gross income derived from a taxpayer's trade or business may be subject to self-employment tax even when it is attributable in whole or in part to services rendered in a prior taxable year. Sec. 1.1402(a)-1(c), Income Tax Regs. "[S]elf-employment income is determined by the source of the income, not the taxpayer's status at the time the income is realized." Schelble v.

**[*16]** <u>Commissioner</u>, 130 F.3d at 1392 (alteration in original) (quoting <u>Shumaker</u> <u>v. Commissioner</u>, 648 F.2d 1198, 1200 (9th Cir. 1981), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1979-71).

Green Country and Mr. Potter agreed that he was an independent contractor. Additionally, petitioners and respondent stipulated that the termination payment was Mr. Potter's money, not Potter Sales'. The termination payment was calculated by multiplying Mr. Potter's previous year's commissions by 1-1/2. Thus if Mr. Potter had earned no commissions in the previous year, the termination payment would have been zero. The termination payment was tied to the quantity and quality of Mr. Potter's work by being based on his previous year's commissions; no adjustments unrelated to his prior services were made in calculating the payment. <u>See</u> <u>Schelble v. Commissioner</u>, 130 F.3d at 1393. Therefore, the termination payment is subject to self-employment tax.[11]

---

[11]The Court notes that this decision follows the U.S. Court of Appeals for the Tenth Circuit--the Circuit in which, absent an agreement between the parties otherwise, these cases are appealable, <u>see</u> sec. 7482(b)--and does not rely on <u>Jackson v. Commissioner</u>, 108 T.C. 130, 140 (1997), which held that "[i]n the interest of promoting uniformity, consistency, and fairness in the disposition of this issue with respect to former insurance agents who receive termination payments under similar contractual agreements, we follow the decision" in <u>Milligan v. Commissioner</u>, 38 F.3d 1094 (9th Cir. 1994), <u>rev'g</u> T.C. Memo. 1992-655. The U.S. Court of Appeals for the Ninth Circuit had reversed the Tax Court, holding that the termination payment due an insurance salesman did not derive

(continued...)

**[*17]** III. <u>Whose Activity, Anyway?</u>

In the notice of deficiency respondent also determined that the activity was not entered into for profit under section 183. Respondent disallowed all of the claimed deductions associated with the activity and included the prize money won for each year as income to the Potters. The parties then stipulated that all of the deductions had been properly substantiated and that if the Court found that the activity was for profit then Potter Sales properly claimed the deductions. Through their stipulation the parties have recrafted the question to be who performed the activity--Mr. Potter in his individual capacity or Potter Sales as a corporation-- because section 183 does not apply to C corporations. <u>See</u> sec. 183(a) ("In the case of an activity engaged in by an <u>individual</u> or an <u>S corporation</u>, if such activity

---

[11](...continued)
from the quality and quantity of his work and was therefore not subject to self-employment tax. Both <u>Jackson</u> and <u>Milligan</u> were about termination payments made to insurance salesmen--and had fact patterns similar to those of many other cases concerning termination payments to insurance salesmen--and the holding in <u>Jackson</u> sought to bring uniformity to that subset of termination payment cases. That "uniformity, consistency, and fairness" does not mean that every case about termination payments must be decided under the holding in <u>Jackson</u>. <u>See</u> <u>Kennedy v. Commissioner</u>, T.C. Memo. 2010-206 (finding that payments received in connection with the sale of an employee benefits consulting business were not capital gain but ordinary income subject to self-employment tax). The U.S. Court of Appeals for the Tenth Circuit has also contrasted other termination payment cases from <u>Milligan</u>. <u>See</u> <u>Schelble v. Commissioner</u>, 130 F.3d 1388 (10th Cir. 1997), <u>aff'g</u> T.C. Memo. 1996-269; <u>Golsen v. Commissioner</u>, 54 T.C. 742, 757 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971).

**[*18]** is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." (Emphasis added.)); sec. 1.183-1(a), Income Tax Regs. (stating that no inference may be drawn from section 183 and its regulations as to whether a C corporation is engaged in an activity for profit); see also Knutsen-Rowell, Inc. v. Commissioner, T.C. Memo. 2011-65 (finding section 183 inapplicable to corporate doll business); Misko v. Commissioner, T.C. Memo. 2005-166 (stating that section 183 does not apply to C corporations).

No evidence was entered into the record questioning Potter Sales' corporate validity. Indeed, respondent has conceded that the deductions related to the activity belong to Potter Sales. There is nothing to preclude Potter Sales from operating multiple trades or businesses or changing from one trade or business to another. That is exactly what happened here; Potter Sales stopped selling potting soil and began operating the activity as its trade or business. The fact that Mr. Potter was the named rider in the competitions does not preclude the activity from being that of Potter Sales. The Court finds that Mr. Potter received any prize winnings as Potter Sales' nominee. Potter Sales performed the activity as a trade or business; section 183 does not apply.

[*19] IV.    Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) authorizes a 20% penalty on the portion of an underpayment attributable to:  (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax.  Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard of rules or regulations" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), aff'g 79 T.C. 714 (1982).  For individual taxpayers there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000.  Sec. 6662(d)(1)(A).  For corporations there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the lesser of 10% of the tax required to be shown on the return for the taxable year (or, if greater, $10,000) or $10 million.  Sec. 6662(d)(1)(B).

Under section 7491(c) the Commissioner bears the burden of production regarding penalties related to individual taxpayers.  Higbee v. Commissioner, 116

**[\*20]** T.C. 438, 446 (2001). That burden of production includes evidence that the penalties were "personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b)(1); Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). Once the Commissioner has met the burden of production, the taxpayer has the burden of proving that the penalties are inappropriate because of reasonable cause or, in the case of a substantial understatement of income tax, substantial authority. See Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), aff'g T.C. Memo. 1982-337; Higbee v. Commissioner, 116 T.C. at 446-447. The Commissioner does not bear the burden of production regarding penalties related to corporations. NT, Inc. v. Commissioner, 126 T.C. 191 (2006).

On January 12, 2018, respondent filed a motion to reopen the record to admit into evidence the declaration of Laura L. Vidal and penalty approval forms for the Potters and Potter Sales for the years in issue. Reopening the record for the submission of additional evidence lies within the Court's discretion. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974), aff'g T.C. Memo. 1971-200; Butler v. Commissioner, 114 T.C. 276, 286-287 (2000). The Court will

**[*21]** grant a motion to reopen the record only if the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. Butler v. Commissioner, 114 T.C. at 287. Petitioners objected to respondent's motion. The Court will deny respondent's motion to reopen the record because, as discussed below, the evidence relied on will not change the outcome of these cases because petitioners acted with reasonable cause and in good faith.

A penalty will not be imposed under section 6662(a) if the taxpayer establishes that he acted with reasonable cause and in good faith. Sec. 6664(c)(1). Circumstances that indicate reasonable cause and good faith include reliance on the advice of a tax professional. Sec. 1.6664-4(b), Income Tax Regs.; see Higbee v. Commissioner, 116 T.C. at 448-449. For a taxpayer to rely reasonably upon advice so as to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's

[*22] judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners meet all of those requirements.  The Potters and Potter Sales used the same CPA to prepare their respective Federal income tax returns for the years in issue.  Petitioners' CPA has been licensed for 35 years, has been the Potters' CPA for almost that long, and has always prepared Potter Sales' corporate income tax returns.  The record reflects that the Potters gave their CPA all the necessary information to prepare their and Potter Sales' tax returns.  The Court is also satisfied that petitioners relied upon the CPA's advice; Mr. Potter had several discussions with their CPA regarding the termination payment and the activity.  Therefore petitioners reasonably relied on their CPA; neither the Potters nor Potter Sales is liable for an accuracy-related penalty for 2010 or 2011.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

**[*23]** To reflect the foregoing,

<u>An appropriate order will be issued denying respondent's motion to reopen the record, and decisions will be entered under Rule 155</u>.